IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOME SEMICONDUCTOR CORPORATION, ) ) ) Plaintiff, ) ) v. ) ) SAMSUNG ELECTRONICS CO., LTD., ) SAMSUNG ELECTRONICS AMERICA, ) INC., SAMSUNG SEMICONDUCTOR, ) INC., and SAMSUNG AUSTIN ) SEMICONDUCTOR, LLC, ) ) Defendants. ) | Civil Action No. 13-2033-RGA **UNDER SEAL** |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this patent infringement action is a motion to dismiss for lack of standing pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) filed by defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), Samsung Semiconductor, Inc. ("SSI"), and Samsung Austin Semiconductor, LLC ("SAS") (collectively, "Samsung"). (D.I. 175) For the reasons that follow, the court recommends GRANTING Samsung's motion to dismiss without prejudice.[1]

---

[1] The briefing for the present motion is as follows: defendants' opening brief (D.I. 176), plaintiff's answering brief (D.I. 192), defendants' reply brief (D.I. 206), and plaintiff's sur-reply brief (D.I. 214).

## II. BACKGROUND

### a. Procedural History

On December 16, 2013, plaintiff Home Semiconductor Corporation ("HSC")[2] originally filed this patent infringement action against SEC, SEA, Samsung Telecommunications America, LLC ("STA"), and SSI, alleging infringement of United States Patent Numbers 5,452,261 ("the '261 patent"), 6,030,893 ("the '893 patent"), 6,146,997 ("the '997 patent"), and 6,150,244 ("the '244 patent"). (D.I. 1 at ¶¶ 2-5, 17-21) Only the '997 patent and the '261 patent remain as the Patents-in-Suit (the "Patents-in-Suit"). The '997 patent and '261 patent relate to methods of manufacturing semiconductor devices. (D.I. 1, Ex. A; Ex. C) The Second Amended Complaint avers that HSC is the owner by assignment of the Patents-in-Suit, and alleges that Samsung's dynamic random-access memories ("DRAMs"), NAND flash memories, and processors are infringing products. (D.I. 188 at ¶¶ 17-18, 24-41)

On May 14, 2014, HSC filed its First Amended Complaint (the "First Amended Complaint"), which added SAS as a defendant. (D.I. 21) On December 17, 2014, Samsung filed petitions for *inter partes* review ("IPR") of the '893 patent, the '997 patent, and the '244 patent before the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("USPTO"). (D.I. 55) The present case was stayed and administratively closed pending the IPRs on December 22, 2014. (*Id.*; D.I. 56) The asserted claims of the '893 patent, the asserted claims of the '244 patent, and claims 1 and 3-8 of the '997 patent were found unpatentable at the conclusion of the IPRs. (D.I. 66) The stay was lifted on November 9, 2017, and on November 28, 2017, a supplemental scheduling order was entered. (D.I. 67; D.I. 70)

---

[2] HSC is a Delaware corporation and a wholly owned subsidiary of Home Semiconductor Corporation, a Samoa corporation ("HSC Samoa"). (D.I. 188 at ¶ 1; D.I. 177, Ex. 21 at 86:5-17; D.I. 192 at 1)

2

On June 11, 2018, HSC dismissed defendant STA, because it had merged into SEA. (D.I. 79; D.I. 80) On June 12, 2018, HSC dismissed its claims with respect to the '893 patent and the '244 patent. (D.I. 81; D.I. 82) On December 28, 2018, HSC filed a motion for leave to amend the First Amended Complaint to add a claim of infringement of the '997 patent under 35 U.S.C. § 271(g).[3] (D.I. 108; D.I. 109)

On May 1, 2019, Samsung filed the present motion to dismiss for lack of standing. (D.I. 175) On May 16, 2019, in a Memorandum Opinion, the court granted HSC's motion for leave to amend the First Amended Complaint. (D.I. 186; D.I. 187) On May 17, 2019, HSC filed its Second Amended Complaint (the "Second Amended Complaint"). (D.I. 188)

**b. Facts**

The '261 patent was invented by Jinyong Chung and Michael A. Murray, who assigned the patent to Mosel Vitelic Inc. ("Mosel Vitelic") on September 7, 1994. (D.I. 188 at ¶ 17; D.I. 177, Ex. 4) The '997 patent was invented by Jacson Liu and Jing-Xian Huang, who assigned the patent to Mosel Vitelic on September 29, 1999. (D.I. 188 at ¶ 18; D.I. 177, Ex. 5) ProMOS Technologies Inc. ("ProMOS") acquired the '261 patent and the '997 patent from Mosel Vitelic on June 20, 2005 and May 24, 2004 respectively. (D.I. 177, Ex. 6; Ex. 7)

On February 27, 2013, ProMOS and Home Semiconductor, Inc. of Samoa ("HSI")[4] executed a Patent Transfer and License Agreement ("PTLA"). (D.I. 177, Ex. 8) Pursuant to the

---

[3] 35 U.S.C. § 271(g) provides that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent." 35 U.S.C. § 271(g).
[4] Plaintiff avers that the entity identified as Home Semiconductor, Inc. of Samoa ("HSI") never existed and, but for a typographical mistake, was intended to mean Home Semiconductor Corporation, a Samoa corporation, the parent company of plaintiff. (D.I. 192 at 14-17) This assertion regarding the mistaken misnomer will be discussed more fully, *infra*.

3

PTLA, ProMOS retained "an irrevocable, non-terminable, non-exclusive license, without the right to sublicense, under the claims of the Transferred Patents, to make, have made, design, have designed, use, sell, offer for sale, import or otherwise dispose of any products." (*Id.* at § 2(a)) ProMOS retained thirty-five percent of the aggregate Net Licensing Revenues[5] above one million dollars. (*Id.* at § 3(b)) The PTLA included a side letter agreement that provided that:

> [P]rior to the commencement of any patent enforcement action brought by HSI against one or more alleged infringers, HSI will provide to ProMOS a patent enforcement plan for its review and commentary. ProMOS and HSI will confer in good faith regarding the alleged infringers in which patent enforcement action(s) shall be brought. However, HSI agrees not to bring any patent enforcement action against Hynix and Elpida unless authorized by ProMOS.

(D.I. 177, Ex. 8) Hsu Kuei-Jong ("Mr. Hsu") signed the PTLA as President and CEO of HSI. (*Id.*)

On September 23, 2013, Home Semiconductor Corporation, a Samoa corporation ("HSC Samoa"), executed a Patent Agreement (the "Patent Agreement") that assigned its interests in several patents, including the '261 patent and the '997 patent, to plaintiff. (D.I. 177, Ex. 11) On the same day, HSC Samoa and plaintiff executed a promissory note in the amount of one million dollars for the purported transfer of the Patents-in-Suit that matured on September 22, 2018, but was never paid. (D.I. 177, Ex. 12; Ex. 21 at 136:15-137:5) Mr. Hsu signed the Patent Agreement as Director and CEO of HSC. (D.I. 177, Ex. 11)

On March 25, 2015, HSI and ProMOS entered into a Patent Cooperation Agreement (the "PCA"), wherein ProMOS appointed HSI as "the exclusive agent to monetize the ProMOS Patent Portfolio," which included the '261 patent and the '997 patent. (D.I. 177, Ex. 13 at § 2(a))

---

[5] "Net Licensing Revenues" is defined by the PTLA as "all accrued licensing revenues received from third-parties by [HSI] or its Affiliates related to the licensing of the Transferred patents after the deduction of applicable taxes." (D.I. 177, Ex. 8 at § 3(b))

4

HSI represented that it was "the sole and lawful owner of the HSI Patent Portfolio and ha[d] the right to monetize such patents under [the PCA]." (*Id.* at § 8(c))

On November 20, 2017, HSI and SK Hynix Inc., a third party, entered into a Covenant Not to Sue Agreement (the "Covenant Not to Sue"), wherein both parties agreed not to initiate any legal action against each other with respect to HSI's patents, which included the '261 patent and the '997 patent. (D.I. 177, Ex. 15 at ¶¶ 2.1, 2.2) Specifically, the Covenant Not to Sue stated:

> 2.1 Covenant Not To Sue to SK hynix [*sic*]. For a period of one (1) year after the Effective Date, [HSI] covenants that (i) it will not initiate or maintain any legal or administrative action alleging patent infringement under any patent claim of any Home Patents with respect to making, having made, using, importing, exporting, distributing, selling, offering for sale, developing and advertising products and services of SK hynix and/or its Subsidiaries and (ii) it will not send written communications to SK hynix and/or its Subsidiaries seeking to engage in licensing negotiations regarding the Home Patents and (iii) it will not send written communications to and/or initiate or maintain any legal or administrative action against customers of SK hynix and/or its Subsidiaries alleging patent infringement under any patent claim of any Home Patents solely with respect to making, having made, using, importing, exporting, distributing, selling, offering for sale, developing and advertising products and services of SK hynix and/or its Subsidiaries.
>
> 2.2 Covenant Not to Sue to [HSI]. For a period of one (1) year after the Effective Date, SK hynix and/or its Subsidiaries covenant that (i) it will not initiate, or support any action or proceeding to challenge the validity, enforceability, or scope of any claim of a Home Patents [*sic*] (including, without limitation, any litigation, reexamination, interference proceeding, *inter partes* review proceeding or other post-grant challenge) (each a "Challenge") for any reason, and (ii) it will not initiate any action seeking a declaration that the products or services of SK hynix and/or its Subsidiaries do not infringe any claims of the Home Patents. SK hynix and/or its Subsidiaries further agree that they will not encourage, assist or support any Third Party in undertaking an action to Challenge the Home Patents that SK hynix of [*sic*] its Subsidiaries would be forbidden from doing under this paragraph 2.2.

(*Id.*) Mr. Hsu signed both the PCA and Covenant Not to Sue as the President of HSI. (D.I. 177, Ex. 13; Ex. 15)

5

## III. LEGAL STANDARD

Standing to sue is a threshold requirement in every federal case. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). Whether a plaintiff has standing to sue is a matter of law to be determined by the court. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873 (Fed. Cir. 1991). "Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination." *Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 747 (9th Cir. 2012). "The party bringing the action bears the burden of establishing that it has standing." *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

A "patentee" has standing to bring a civil action for patent infringement. *See* 35 U.S.C. § 281. The "patentee" is the owner of the patent, either by issuance or assignment. *See* 35 U.S.C. § 100(d). An assignment by the patent title holder thus gives the assignee standing to bring an infringement action in his or her own name. *See Vaupel Textilmaschinen KG*, 944 F.2d at 875; *see also Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). A patent owner's transfer of "all substantial rights" in the asserted patents to an exclusive licensee "is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the licensee" and divesting the patent owner of any right to sue. *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1358-59 (Fed. Cir. 2010). Where an exclusive license agreement transfers less than "all substantial rights" in the patents, "either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation." *Id.* at 1360.

"It is well settled that whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the

6

legal effect of its provisions." *Vaupel Textilmaschinen KG*, 944 F.2d at 875 (alteration and internal quotation marks omitted). Thus, to determine whether an exclusive license agreement transfers "all substantial rights" in the patents to the licensee, the court "must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001). Courts consider whether the licensor granted various rights to the exclusive licensee to determine whether the license rendered the exclusive licensee the owner of the patent. *See Alfred E. Mann Found.*, 604 F.3d at 1360-61 (*e.g.*, "the exclusive right to make, use, and sell product or services under the patent, . . . the licensee's right to sublicense, . . . the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent"). Often, "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration." *Id.* at 1361. That the licensor retained the right to sue accused infringers often precludes a finding that all substantial rights were transferred to the licensee, unless that right is illusory. *See id.* A "licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers." *Id.*

## IV. DISCUSSION

### a. Whether HSI transferred rights in the asserted patents to plaintiff

The source of the standing controversy in issue is whether HSC Samoa and HSI are one and the same entities.

HSC contends that the PTLA's reference to "Home Semiconductor Incorporated" instead of "Home Semiconductor Corporation" is a typographical error.[6] (D.I. 192 at 14-17) HSC avers that there is no such entity named "Home Semiconductor Incorporated" in Samoa, but there is a "Home Semiconductor *Corporation*" in Samoa.[7] (*Id.* at 14) In support of this assertion, HSC notes that Mr. Hsu, the sole director of HSC, testified that he had not heard of a Home Semiconductor Incorporated of Samoa. (*Id.* at 14-15; D.I. 193, Ex. A at 123:14-17) HSC also alleges that the Patent Agreement between HSC Samoa and plaintiff correctly identifies HSC Samoa as the transferor. (D.I. 192 at 15)

HSC cites *Special Happy, Ltd.*, *Lincoln Imports, Ltd.*, and *Aevoe Corp.* to support its argument that typographical errors do not affect standing. (D.I. 192 at 16) However, these cases are inapposite. "The existence of a good faith clerical mistake in an assignment will not defeat an assignee's standing to pursue an infringement claim." *Special Happy, Ltd. v. Lincoln Imports, Ltd., Inc.*, 2011 WL 2650184, at *5 (C.D. Cal. July 6, 2011). In these cases, the existence of a typographical error was not fatal to standing because there were some indicia that made "assignment clear and unambiguous." *Lincoln Imports, Ltd., Inc. v. Santa's Best Craft, Ltd.*, 2008 WL 2754530, at *1 (S.D. Tex. July 14, 2008); *see also Aevoe Corp. v. AE Tech Co., Ltd.*, 13 F. Supp. 3d 1072, 1075-76 (D. Nev. 2014).

---

[6] HSC also suggests that Samsung's motion to dismiss is untimely. (D.I. 192 at 18) However, Samsung argues that HSC did not produce the agreements at issue until October 2018. (D.I. 206 at 9) Furthermore, Mr. Hsu, the sole director of HSC, was not deposed until March 19 and 20, 2019. (*Id.*; D.I. 177, Ex. 21; Ex. 22)

[7] HSC argues that "a search of the Delaware public records for 'Home Semiconductor Incorporated' shows no such corporation existing in Delaware, only a Home Semiconductor Corporation." (D.I. 192 at 15) However, the parties are not disputing the existence of a "Home Semiconductor Incorporated" in Delaware, but rather a "Home Semiconductor Incorporated" in *Samoa*.

8

Even assuming, *arguendo*, that there was a typographical error, it is not "clear and unambiguous" that ProMOS made an assignment to HSC Samoa. Under the Patent Agreement, plaintiff, a Delaware corporation, purportedly acquired the asserted patents from HSC Samoa. (D.I. 177, Ex. 11) Despite the alleged assignment to plaintiff in 2013, the PCA was subsequently executed between ProMOS and HSI in 2015 and the Covenant Not to Sue was executed in 2017.[8] (D.I. 177, Ex. 11; Ex. 13; Ex. 15) The PCA states that HSI is a *Samoa* corporation and "is the sole and lawful owner of the HSI Patent Portfolio," which includes the '261 patent and the '997 patent. (D.I, 177, Ex. 13 at § 8(c)) Although plaintiff argues that no such entity as HSI exists, Mr. Hsu executed multiple documents, including the PTLA, PCA, and Covenant Not to Sue as the President of HSI.[9] (D.I. 177, Ex. 8; Ex. 13; Ex. 15) Moreover, the inconsistency goes

---

[8] Mr. Hsu testified that he did not know whether HSC Samoa offered a license to SK Hynix after the expiration of the Covenant Not to Sue and that ProMOS would have this knowledge. (D.I. 177, Ex. 22 at 273:12-274:18)

[9] At his deposition, the following exchange occurred with Mr. Hsu:

- Q: In the first paragraph of [the PTLA], in the body of the letter itself, it says: "I am the president and CEO of Home Semiconductor, Inc., a Samoa corporation." Is that supposed to be "Home Semiconductor Corporation"?

- A: That's supposed to be.

- Q: Do you know who prepared this document?

- A: I believe it was probably our law firm, but I'm not very sure.

- Q: Before you would have signed this document, do you believe that you would have understood what this document to have said?

- A: That is correct.

- Q: In the first paragraph, in the third line, there is a reference to Home Semiconductor, Inc. U.S.A., a Delaware corporation. Is that supposed to be say [*sic*] "Home Semiconductor Corporation"?

9

beyond a change from "HSC" to "HSI," as, under the PCA, HSI represented itself as a *Samoa* entity that owned the asserted patents after the alleged assignment to plaintiff. Furthermore, this "typographical error" has been repeatedly perpetuated without any effort to correct or verify HSI's identity arguably due to Samoan secrecy laws.[10] Plaintiff does not allege in its Second Amended Complaint that such a typographical error exists, but rather states so in a conclusory fashion in its briefing. (D.I. 188; D.I. 192 at 2, 6, 14-17) Here, there is a complete lack of any independent indicia that this is a typographical error. Accordingly, it is not "clear and unambiguous" that ProMOS intended make the assignment to HSC Samoa. Therefore, dismissal is recommended due to plaintiff's failure to satisfy the burden to show that it has standing.

### b. Whether ProMOS' absence from this case defeats standing

Assuming, *arguendo*, that the reference to Home Semiconductor *Incorporated* of Samoa is really intended to be Home Semiconductor *Corporation* of Samoa, but for a typographical error, the court's recommendation for dismissal based upon lack of standing would not change. In determining whether an agreement transferred all substantial rights to the patents, courts examine several factors, including: the nature and scope of the transferee's right to bring suit, the exclusive right to make, use, and sell products or services under the patents, and the right of the transferor to receive a portion of the recovery in infringement suits brought by the transferee. *See Alfred E. Mann Found.*, 604 F.3d at 1360-61; *see also Diamond Coating Technologies, LLC v. Hyundai Motor America*, 823 F.3d 615, 619 (Fed. Cir. 2016) ("We 'have never . . .

---

    A:    Yes.

(D.I. 177, Ex. 21 at 162:3-22)

[10] Samsung contends that it is impossible to independently verify whether HSI exists as a separate entity in Samoa because of Samoan secrecy laws. (D.I. 176 at 17 n.13) HSC counters that Samsung's discovery requests are broad enough to capture corporate documents for HSI if it existed. (D.I. 192 at 15)

establish[ed] a complete list of the rights' that 'must be examined to determine whether a [patentee] has transferred away sufficient rights to render an[other party] . . . the owner of a patent.'") (internal citation omitted).

### i. Control over enforcement and litigation activities

"The most significant consideration in deciding the standing inquiry is the nature and scope of the parties' rights to bring suit for infringement." *EMC Corp. v. Pure Storage, Inc.*, 165 F. Supp. 3d 170, 175 (D. Del. 2016) (citing *Alfred E. Mann Found.*, 604 F.3d at 1361). Plaintiff argues that the PTLA does not condition litigation or licensing activities on ProMOS' best interests. (D.I. 192 at 9) However, the PTLA requires HSI[11] to provide a patent enforcement plan to ProMOS "for its review and commentary" so that HSI and ProMOS can "confer in good faith regarding the alleged infringers in which patent enforcement action(s) shall be brought." (D.I. 177, Ex. 8) The PTLA further requires HSI to obtain ProMOS' authorization to sue Hynix and Elpida and meet and confer with ProMOS before initiating all other patent infringement suits. (*Id.*) In *Diamond Coating*, the transferor similarly "limit[ed] [the transferee's] discretion to refrain from suing certain companies" on a list. *See Diamond Coating*, 823 F.3d at 621. The court concluded that if the transferee "had unfettered discretion on enforcement, then [the list] would be superfluous" and, consequently, the transferor had retained significant control over the transferee's enforcement and litigation activities. *Id.*

The Federal Circuit has noted that "'a transferee that receives all substantial patent rights from a transferor would *never* need consent from the transferor to file suit.'" *Lone Star Silicon*

---

[11] As the court discussed in section IV(a) *supra*, HSC argues that HSI does not exist, and the PTLA erroneously references HSI instead of HSC. For the sake of clarity, the court will continue to refer to the parties of the PTLA as "ProMOS" and "HSI," as they appear in the PTLA. (D.I. 177, Ex. 8)

*Innovations LLC v. Nanya Technology Corp.*, 925 F.3d 1225, 1231 (Fed. Cir. 2019) (quoting *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001) (emphasis added)). Because ProMOS decides whether HSI can sue Hynix and Elpida and HSI is required to meet and confer with ProMOS before initiating any patent infringement suits, ProMOS did not fully transfer the right to enforce the Patents-in-Suit. *See id.* at 1232 ("[T]he effect of this agreement is that [the transferor] did not fully transfer the right to enforce its patents. The fact that [the transferor] may have transferred some rights, with respect to certain unlisted entities, does not mean it transferred all substantial rights in the full scope of the patent."). Furthermore, the fact that the PTLA allows HSI to initiate suits alleging infringement of the asserted patents is not, in itself, indicative of HSI's possession of all substantial rights. *See id.*

Plaintiff cites *Abbott Labs.* and *Intuitive Surgical, Inc.* to argue that requirements imposed by the PTLA are minor and not fatal to its standing to bring suit independently. (D.I. 192 at 10) However, these cases do not support plaintiff's assertion. The court in *Abbott Labs.* concluded that the transferee did not have an independent right to sue because the transferor retained substantial interests, including an interest in litigation activities, in the asserted patents. *See Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131-33 (Fed. Cir. 1995) ("[A]lthough [the transferee] has the option to initiate suit for infringement, it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue."). Furthermore, the court in *Abbott Labs.* noted that the parties appeared to "contemplate[] that [the transferor] could participate in a suit brought by [the transferee], because the agreement provides that [the transferor] is 'entitled to be represented therein by counsel of its own selection at its own expense.'" *See id.* at 1132. Here, HSC similarly does not have an independent right to sue

12

because ProMOS retained substantial interests in the Patents-in-Suit, including control over enforcement and litigation activities. The court in *Intuitive Surgical* analyzed whether the transferee had standing to be a *co-plaintiff* by virtue of its exclusive license, not whether it had standing to sue independently after an assignment. *See Intuitive Surgical, Inc. v. Computer Motion, Inc.*, 214 F. Supp. 2d 433, 439-440 (D. Del. 2002). Here, the question is whether plaintiff has standing to sue for infringement independently based upon the alleged transfer of all substantial rights in the Patents-in-Suit. Therefore, by limiting HSI's discretion in pursuing certain patent enforcement actions, ProMOS retained significant control over the asserted patents' enforcement and litigation activities.

### ii. Rights to practice the asserted patents

"[T]ransfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment." *Alfred E. Mann Found.*, 604 F.3d at 1360 (citing *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193-94 (Fed. Cir. 2007)). Although HSC argues that HSI received "all right, title and interest in and to the" asserted patents, "[o]ur analysis in these types of cases has never been so reliant on labels." (D.I. 192 at 13) *See also Lone Star*, 925 F.3d at 1230. Instead, "it is the effect of the agreement on the respective rights of the patentee and the transferee that controls." *Lone Star*, 925 F.3d at 1232. A "retention of a limited right to develop and market the patented invention indicates that the licensee failed to acquire all substantial rights." *Diamond Coating*, 823 F.3d at 619 (quoting *Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004)).

In *Diamond Coating*, the transferor retained the right to make, use and sell products covered by the patents-in-suit and limited the transferee's rights to "prosecution, maintenance, licensing, litigation, enforcement and exploitation" of the patents-in-suit. *Id.* at 619-620. Here,

13

ProMOS retained "an irrevocable, non-terminable, non-exclusive license, without the right to sublicense, under the claims of the Transferred Patents, to make, have made, design, have designed, use, sell, offer for sale, import or otherwise dispose of any products." (D.I. 177, Ex. 8 at § 2(a)) Therefore, ProMOS did not transfer all substantial rights in the asserted patents through the PTLA.

### iii. Economic interest in future proceeds from the asserted patents

HSC argues that a financial interest in litigation and licensing, without more, does not amount to a substantial right forcing joinder of the patentee. (D.I. 192 at 13) However, Samsung is not only arguing that ProMOS retained a financial interest in the asserted patents, but also that ProMOS retained significant control over enforcement and litigation activities and rights in the practice of the asserted patents. "[T]he fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent . . . does not necessarily defeat what would otherwise be a transfer of all substantial rights . . . [but] the fact that [the transferor] retains a substantial share of the proceeds is consistent with [transferor's] retaining ownership rights in the patent . . . ." *Propat*, 473 F.3d at 1191. Here, pursuant to the PTLA, ProMOS retained thirty-five percent of the aggregate Net Licensing Revenues above one million dollars. (D.I. 177, Ex. 8 at § 3(b)) Taken with the other factors, HSI did not acquire all substantial rights in the asserted patents.

### c. Whether the court should dismiss with prejudice

Samsung argues that, if the court finds that HSC lacks standing, dismissal should be with prejudice. (D.I. 176 at 19-20) Samsung cites *National Oilwell*, which granted a motion to dismiss for lack of standing with prejudice because plaintiff was "aware of the 'web of confusion it was weaving'" but failed to "fill the void" created by the absence of a written assignment. *National Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 676 F. App'x 967, 972 (Fed. Cir. 2017). *National Oilwell* is distinguishable because the plaintiff in that case had been put on notice of its lack of standing due to a *promise* of an assignment, rather than an outright assignment of patent rights. *See id.* at 971-72.

"Ordinarily, dismissal for lack of standing is without prejudice." *Fieldturf, Inc.*, 357 F.3d at 1269 (citing *H.R. Tech., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1385 (Fed. Cir. 2002)). The court recommends dismissing the Second Amended Complaint without prejudice.

### V. CONCLUSION

For the foregoing reasons, the court recommends granting defendants' motion to dismiss without prejudice. (C.A. No. 13-2033, D.I. 175)

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **January 21, 2020**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d

Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: January 14, 2020

Sherry R. Fallon
United States Magistrate Judge